# EXHIBIT B

## AFFIDAVIT OF MCGUSTAVUS MILLER, JR., CHIEF RESTRUCTURING OFFICER

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

INSTASET PLASTICS COMPANY, LLC,   Case No.: 22-47794-tjt
                                  Chapter 11
Debtor.                           Hon. Thomas J. Tucker

---

**AFFIDAVIT OF MCGUSTAVUS MILLER, JR., IN SUPPORT OF CHAPTER 11 PETITION, FIRST-DAY MOTIONS, AND OTHER RELIEF**

STATE OF MICHIGAN   )
                    ) SS
COUNTY OF MACOMB    )

McGustavus Miller, Jr., being duly sworn, deposes and says:

1. I have been appointed the Chief Restructuring Officer ("CRO") of Instaset Plastics Company, LLC, ("IPC", "Debtor", or "Company"). In my capacity as CRO, I am familiar with the day-to-day operations, business affairs, corporate structure, and books and records of the Debtor. I am authorized to submit this affidavit (the "Affidavit") on behalf of the Debtor.

2. I make this Affidavit to assist the Court and other parties in understanding the circumstances that compelled the Debtor to file its Chapter 11, Subchapter V proceeding, and the following first day motions:

1

a. First Day Motion (A) Authorizing Debtor in Possession to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §105, 361, 362, 363, and 364; (B) Granting Liens, Security Interests, and Superpriority Claims; (C) Authorizing the Use of Cash Collateral and Granting Adequate Protection; (D) Modifying the Automatic Stay; and (E) Scheduling a Final Hearing;

b. First Day Motion for Authorization (A) to Pay Pre-Petition Wages, Salaries, Benefits, and Reimbursable Expenses, and to Continue Existing Employee Policies; and (B) to Continue in Effect Workers' Compensation Programs;

c. First Day Motion for Order Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services Pending Determination of Adequate Assurance of Payment for Future Utility Services, and Approving the Proposed Adequate Assurance Procedures Under Section 366 of the Bankruptcy Code;

d. First Day Motion for Order Authoring Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, and Granting Other Relief.

3. Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge, is information supplied to me by employees of the Debtor and/or professionals retained by the Debtor, that I learned through review of relevant documents, or is my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4. IPC commenced this voluntary case under Chapter 11, Subchapter V, of the Bankruptcy Code on October 5, 2022 (the "Petition Date"). The Debtor is

2

authorized to continue to operate its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. As of the filing of this Affidavit, the Court has not appointed the Subchapter V Trustee.

## GENERAL BACKGROUND

6. In May of 2015, WGS Global Services, L.C. ("WGS"), as sole member of Instatset Acquisition Company, LLC ("IAC"), acquired the assets and ongoing operations of Instaset Corporation (k/n/a Old Instaset Corporation) ("IC"). The acquisition closed in November of 2015, and the name was immediately changed to Instaset Plastics Company, LLC. In May of 2021, Christopher Goetz acquired WGS's equity position in IPC, becoming the sole member of IPC.

7. In June of 2021, I assumed an advisory role to IPC as the Company worked to recover from the impact of the COVID-19 pandemic. In January of 2021, my role with the Company expanded and I assumed the responsibilities of a Chief Financial Officer.

8. IPC operates as a plastic injection molding facility, producing parts incorporated into Class A surfaces for the automotive industry.

9. IPC's facility is located at 10101 Marine City Hwy, Anchorville, Michigan 48023 (the "Anchorville Property"). IPC has leased the Anchorville Property since June 2021. The Anchorville Property is owned by WGS Properties,

LLC, a Michigan limited liability company. The current lease is dated June 1, 2021 and expires on May 31, 2031.

10. In 2015, IPC's annual revenue from sales ranged between $18M and $22M. IPC had production contracts with several Tier 1 and Tier 2 suppliers associated with multiple OEM platforms.

11. Shortly after the acquisition of the IC assets, IPC began experiencing a loss in sales due to significant volitivity in the automotive industry.

12. In 2018, two significant events had a direct impact on IPC–the announcement by General Motors of its intent to shut down the Lordstown plant and the explosion at the Meridian Magnesium Products of America Plant ("Meridian") – leading to a significant decline in sales and a resulting reduction in revenue.

13. At that time, internal struggles also led to a reduction in revenue. The preacquisition management team's agenda was not progressive, they did not implement necessary price increases to maintain margins, and were resistant to diversification in the customer base.

14. In early 2020, IPC's operations were stabilizing and revenue was steadying at the $4M to $6M range. However, the Government's shutdown in March of 2020 had a devastating impact on the Company's ability to continue recovery.

15. The cumulative effect of labor and supply chain shortages along with increases in raw material costs has burdened IPC with substantial debt and no

adequate means to generate revenue sufficient to continue to meet customer requirements.

## CURRENT EMPLOYEES AND MANAGEMENT TEAM

16. At acquisition, the Company had 68 employees. Since that time, the number of employees has been trimmed to accommodate lost contracts and resulting reductions in revenue. IPC currently employs approximately 50 employees, including skilled line operators, production supervisors, managers, and engineers (collectively, the "Employees").

17. Due to the nature of the Class A parts and customer requirements, IPC's employees are highly skilled and trained on the production lines and customer requirements.

18. The management team consists of Christopher Goetz, Chief Executive Officer and sole member; Joseph Goetz, vice president of manufacturing; Peter Buczek, acting director of human resources; and myself as acting CRO.

19. I have worked in the manufacturing industry for over 30 years. Prior to joining IPC, I served as the director of sales for a casting importer for 2 years, importing products from India and China. I also served as the general manager of a foundry for 10 years. I have a bachelor's degree in physics with a minor in mathematics, from James Madison University. I subsequently received a Master of

Business Administration from the University of Phoenix. I continued my studies at Dartmouth College in New Hampshire, enrolling in an executive studies program.

## THE PREPETITION SECURED CLAIMS

20. In order to meet operational expenses, IPC obtained a line of credit from The Huntington National Bank ("Huntington Bank") and WGS as follows

   A. **The Note**. Debtor is indebted to the Huntington Bank pursuant to an Amended and Restated Promissory Note, dated May 13, 2019, executed by Debtor and WGS as co-borrowers, in favor of Chemical Bank, and now held by Huntington Bank, in the original principal sums of (i) up to $2,000,000.00, as subsequently reduced to the maximum principal sum of $1,250,000.00 ("Huntington Note");

   B. **The Loan Agreement**. In conjunction with the extensions of credit and other accommodations between the Debtor, WGS, and the Huntington Bank, the following documents, among others, were executed (collectively, the "Loan Agreements"), which set forth additional terms and conditions governing the loan relationship:

   B.1 **The Loan Agreement**. An Amended, Restated, and Consolidated Business Loan Agreement dated May 13, 2019, executed by the Debtor, WGS, and Chemical Bank, successor by merger to Talmer Bank and Trust ("Loan Agreement"). The Loan Agreement by its terms (i) amended, restated, and consolidated prior Loan Agreements between Huntington Bank (through its predecessors in interest) and the Debtor and Huntington Bank (through its predecessors in interest) and WGS, and (ii) cross collateralized and cross defaulted the Debtor's outstanding obligations owed to Huntington Bank with WGS's outstanding obligations owed to Huntington Bank.

   B.2 **The First Amendment**. A First Amendment to an Amended, Restated, and Consolidated Business Loan Agreement and Loan Documents dated June 30, 2020, executed by the Debtor, WGS, and Chemical Bank, a division of TCF National Bank, successor by merger to Chemical Bank, and others.

   B.3 **The Second Amendment**. A Second Amendment to an Amended, Restated, and Consolidated Business Loan Agreement and Loan

6

Documents dated January 25, 2021, executed by Debtor, WGS, and Chemical Bank, a division of TCF National Bank, successor by merger to Chemical Bank, and others.

    C.    <u>The Security Agreement</u>. An Amended and Restated Security Agreement dated January 25, 2021, executed by Debtor in favor of TCF National Bank, successor in interest to Chemical Bank, now held by Huntington Bank, granting a security interest upon all of its assets.

21. The Debtor's approximate outstanding balances due to Huntington Bank as of the Petition Date is $557,310.81.

22. WGS's secured interest in Debtor is junior to Huntington Bank. Debtor is indebted to WGS pursuant to the RLOC Note effective on January 1, 2022, in the original principal sum of up to $2,000,000.00.

23. The approximate outstanding balance due to WGS as of the Petition Date is $692,745.20 under the RLOC Note.

## DEBTOR'S PREPETITION ASSETS

24. As of the Petition Date, the Debtor's assets were chiefly made up of (1) earned accounts receivable, (2) executory contracts, and (3) inventory and equipment used in the Debtor's operations. The Debtor estimates the fair market value of its assets on the Petition Date as follows:

| | |
|---|---|
| Accounts Receivable: | $ 813,542.14 |
| Personal Property: | $ 510,000.00 |
| Cash on Hand: | $    9,974.00 |
| Total: | $1,333,516.14 |

## EVENTS LEADING TO THE BANKRUPTCY

25. A number of factors have contributed to the IPC's decision to file for relief under Chapter 11, Subchapter V of the Bankruptcy Code.

26. Declining sales, the impact of the COVID-19 pandemic, and changes in the automotive industry have impacted Debtor's revenue on a declining annual basis since 2018.

27. Significant engineering and technological advancements by the OEMs resulted in contract pull-aheads causing IPC's customers to pull tooling and production.

28. Significantly impacting IPC's revenue was when Toyo Automotive contracts, that were scheduled to continue through 2022, were terminated in 2018. This pull of production reduced sales and revenue by $5M, to $6M.

29. Also in May 2018, the Company lost sales as a result of the explosion at the Meridian plant which led to parts shortages and Ford's suspension of production of the F-150 pickup truck. Prior to the explosion, IPC produced a Class A plastic handle utilized in the backseat assembly of the F-150. During the shutdown, Ford implemented new technology, replacing IPC's handle with a pull-tab mechanism.

30. Historically, IPC produced plastic injection molding products solely for the automotive industry. Following its revenue decrease in 2018 and with minimal

increases in sales in 2019, IPC laid off employees in order to cut costs and aggressively began pursuing new customers. In addition, IPC began to diversify its customer base and entered into a supply contract with NYX, for automotive and medical components.

31. NYX began transitioning 40 tools onto IPC's floor for fulfillment. Despite good faith efforts by both IPC and NYX, the tool transition was significantly delayed and caused compressed margins. Concurrently, well-intentioned but rigid long-time management was resistant to the diversification which impaired IPC's attempts to ramp up production for NYX.

32. As a result, IPC was not able to meet production demands on the NYX contracts and ultimately the contracts were terminated and the tooling pulled from IPC.

## IMPACT OF COVID-19

33. By early 2020, IPC was reeling from the depleted resources and significant losses in revenue. The COVID shutdowns in March of 2020 exacerbated IPC's downturn as it heavily impacted the automotive industry.

34. IPC production was shut down for 3 to 4 weeks. Even when production started back up, issues continued to plague IPC production and contracts. After COVID-19 restrictions were lifted, programs continued to die off and revenue sank to $4M.

9

35. In particular, the Lordstown shutdown resulted in loss of contracts for plastics components for the Chevy Cruze. Even when new contracts were entered into in connection with General Motors for SUV and truck parts production, an insufficient workforce made it impossible to meet production demands. IPC lacked line workers to operate the tooling and insufficient supervision led to a lack of production controls.

36. Additionally, increased post-COVID-19 restrictions limiting importation of raw material led to increased cost of raw materials further reducing profitability.

37. In late 2021, Debtor was unsuccessful in its customer requests for price increases in order to defray the impact of increase costs of labor and raw materials.

38. All of these factors, both pre- and post-COVID-19, have contributed to IPC's inability to remain profitable in its current state of operations. After contemplating all available and feasible options, IPC has determined a Chapter 11, Subchapter V liquidation and asset sale of its executory contracts provides the most favorable outcome to its current customers and creditors.

## DEBTOR'S NEED FOR USE OF CASH COLLATERAL

39. It is necessary for IPC to use its operating cash in order to maintain business and the going concern value for the benefit of creditors. Of immediate urgency is the need to fund payroll and to satisfy vendors on a going forward basis.

10

40. The Debtor proposes to use the Cash Collateral for the payment of employee salaries, payroll, taxes, and other general operating and working capital purposes in the ordinary course of business to ensure that operations are not interrupted.

41. The Debtor has prepared and delivered to The Huntington National Bank, ("Huntington Bank") and WGS an initial 13-week projected budget and such budget has been reviewed by the Debtor and its management team.

42. Debtor, Huntington Bank and WGS have engaged in negotiations for the consensual use of the Cash Collateral and the extension of debtor-in-possession financing ("DIP Financing").

43. The Debtor has and will continue to need the use of the Cash Collateral to pay immediate necessary ordinary course of business expenditures. These expenditures will enable the Debtor to continue operating its business in the ordinary course, immediately fund its payroll in order to maintain, and safeguard the pre-petition collateral. The Debtor's use of the Operating Cash is also necessary to maintain the value of the Pre-Petition collateral and to provide IPC with working capital necessary to maintain operations in order to transition the contracts to Clarion Technologies, Inc. Absent the use of Cash Collateral and the approval of the DIP Financing, IPC does not have adequate working capital to continue operations.

44. Immediate irreparable harm will occur to the Debtor, the employees, creditors, and the estates if the Debtor is unable to use Cash Collateral and obtain DIP Financing.

45. In the absence of a court order authorizing the use of the Cash Collateral and the approval of the DIP Financing, the Debtor will be unable to meet its payroll and other operating expenses and will be forced to cease operations immediately, rather than continuing efforts to maximize value for the estates and creditors.

[signature on following page]

Pursuant to 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

If sworn, Affiant can testify competently to the facts set forth herein.

**FURTHER DEPONENT SAYETH NOT.**

_____
McGustavus Miller, Jr.
Chief Restructuring Officer

*S&B\85391\001\PLDG\SB791693.DOCX